**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIN D. SCHMITT; and, | ) | Civil Action No. 09 - 1517 |
| JEFFREY C. SCHMITT, | ) | |
| | ) | |
| Plaintiffs, | ) | Judge Cercone |
| | ) | Chief Magistrate Judge Lenihan |
| v. | ) | |
| | ) | |
| STATE FARM INSURANCE COMPANY | ) | ECF No. 23 |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.      RECOMMENDATION**

It is respectfully recommended that the Motion for Partial Summary Judgment (ECF No. 23) filed by Defendant, State Farm Fire and Casualty Company, be granted.

**II.      REPORT**

Plaintiffs, Erin D. Schmitt ("Plaintiff" or "Mrs. Schmitt") and Jeffrey C. Schmitt, instituted this action against their homeowner's insurance carrier, State Farm Fire and Casualty Company ("State Farm") for breach of contract and bad faith pursuant to 42 Pa. Cons. Stat. §8371.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a), 1441(b).  Venue in this District is proper under 28 U.S.C. § 1441(a).

One issue is presented in the pending partial summary judgment motion:  whether State Farm acted in bad faith towards Plaintiffs by refusing and continuing to refuse to pay Plaintiffs' entire claim under the insurance policy.  Because the Court finds that no material issues of fact exist, and Defendant State farm is entitled to judgment as a matter of law, the Court recommends that State Farm's Motion for Summary Judgment be granted.

**A.      Factual History**

The material facts are not disputed. This is an insurance coverage case in which Plaintiffs allege breach of contract and bad faith under 42 Pa. C.S.A. § 8371. (*See* Compl. generally, ECF No. 1, Attach. #2, Ex. A.) On June 8, 2008, Plaintiff, Erin Schmitt, discovered a water leak from a broken water pressure gauge in the finished basement of the Plaintiffs' home. (Compl. ¶¶ 8-9; *see also* E. Schmitt Dep., pp. 42-5, Sep. 23, 2010, ECF No. 26-1.) At the time of this leak, the Schmitts maintained a homeowner's insurance policy, policy no. 38-0390832-9, issued by State Farm ("the Policy"). (Compl. ¶¶ 6-7.)

On the evening immediately after discovering the loss, believing that the Shaler Water Authority was responsible for the loss, Mrs. Schmitt telephoned the Shaler Water Authority. (E. Schmitt Dep. 57:10-23.) While waiting for the Water Authority's employee to arrive, Mrs. Schmitt, her sons, brother-in-law, and neighbors immediately began to attempt to salvage the Schmitt's personal property which had been on the floor and/or which had gotten wet by moving it off of the floor. The Schmitts also began using fans and dehumidifiers, opened their windows, and ran their air conditioner in an attempt to dry the carpet. (E. Schmitt Dep. 58-61, 71-73.) Jeffrey Schmitt also attempted to dry the carpet by using a wet vac. (E. Schmitt Dep. 74-77.) The Schmitts also laundered some items and separated and laid out wet items in front of fans to attempt to dry them. (E. Schmitt Dep. 58-61, 71-73.)

On June 10, 2008, Mrs. Schmitt called her insurance agent, John Rinker, regarding the water leak. (Compl. ¶ 14; E. Schmitt Dep. 78:3-12.) Mrs. Schmitt made several telephone calls to her State Farm Insurance Agent requesting that a State Farm claims adjuster come to inspect the damage to her property. (E. Schmitt Dep. 83-85, 93.) On June 18, 2008, after these phone calls, State Farm claim representative Jon Forgrave met with the Plaintiffs and inspected their property. (Compl. ¶¶ 19-20; Forgrave Aff. ¶ 5, ECF No. 26-3.) Mr. Forgrave also provided

Plaintiff with a limited number of inventory forms upon which he instructed Mrs. Schmitt to record the personal property which had been damaged. (E. Schmitt Dep. 83-85, 93.)

On Thursday, June 19, 2008, Mark Bougher and Neal Martel of ServPro (collectively "Serv Pro") arrived at the Schmitt's residence to assist Plaintiffs with mitigation and restoration services. (Compl. ¶ 23; E. Schmitt Dep. 97-8.) As part of the mitigation services, and in addition to fans and dehumidifiers already in use by the Schmitts, ServPro provided equipment which included dehumidifiers and fans. (E. Schmitt Dep. 58-61, 71-73, 98; Compl. ¶ 28.) ServPro also removed damaged property from the Schmitts' home. (Compl. ¶ 23; E. Schmitt Dep. 99-100.)

ServPro initially discarded this property in a dumpster that it delivered to, and later removed from, the Schmitt residence. (E. Schmitt Dep. 100, 106.) ServPro also moved items into the garage as salvageable but later admitted in their statement that some of those items were not salvageable, such as a dresser, computer, and TV. (*See* Martel and Bougher Statement at p. 14, ECF No. 27-3, Exhibit 5.) Most of the items removed to the garage were subsequently discarded by ServPro. Additionally, numerous items were placed in a ServPro van with the understanding that ServPro would later discard these items. (E. Schmitt Dep. 99-110.)

For the most part, while Serv Pro discarded the damaged property in June 2008, Mrs. Schmitt sat in her garage, which was connected to the basement. (E. Schmitt Dep. 100.) Serv Pro would show Mrs. Schmitt what they were discarding on their way to the dumpster. (*Id.*) However, Mrs. Schmitt was not present the entire time Serv Pro was at her residence, and there were several items which she was not shown prior to disposal. (Martel and Bougher Statement at p. 26, ECF No. 27-3, Exhibit 6; E. Schmitt Dep. 130, 191.) For example, Mrs. Schmitt testified that no one showed her anything that had been in the entertainment center being

discarded, including the DVDs and CDs.  (E. Schmitt Dep. 130-133, 190-193.)  When shown what was being discarded, Mrs. Schmitt would record "to the best of [her] ability" a description of the items on a legal pad.  (E. Schmitt Dep. 101, 126-29.)  Regarding the accuracy of this recording process, Mrs. Schmitt has testified:

> And I believe unless I missed things when I took a bathroom break or something, I was very accurate because they [ServPro] actually stopped and showed me, and I would actually check, "Oh, that's that," a Vera Wang sheet or whatever I bought or whatever.

(E. Schmitt Dep. 102.)

On the days that ServPro was performing these services, as well as on the day that she discovered the water leak, Mrs. Schmitt needed to use crutches due to an ankle injury sustained in February 2008.  (E. Schmitt Dep. 20, 45-6, 100.)

There was no water damage in the laundry room, and Mrs. Schmitt testified that Plaintiffs have not claimed any personal property damage in the laundry room.  (E. Schmitt Dep. 68.)  However, Mr. Martel stated that there were clothing items in the laundry room that had been in the basement, and Mrs. Schmitt testified that she had attempted to wash some of the clothing prior to the date ServPro came.  (Martel and Bougher Statement at 17, ECF No. 27-3, Exhibit 11; E. Schmitt Dep. 116.)

### Plaintiff's Damages Claims

On July 25, 2008, State Farm received from the Schmitts a 13-page Personal Property Inventory ("PPI") worksheet, dated July 21, 2008 ("July 21st PPI worksheets"), that claimed personal property or contents damage in the amount of $37,979.61.  (Romano Aff. ¶ 3, ECF No. 27-1; *see also* Romano Aff. Attach A.)  Erin Schmitt testified that this PPI worksheet was not complete and that she informed State Farm claims representative Sheryl Zidek of this fact prior to its submission.  Mrs. Schmitt testified that she was told by Ms. Zidek to submit the form in its

current state to begin the process. (E. Schmitt Dep. 110.) State Farm determined that, considering depreciation, the actual cash value ("ACV") for personal property included on the July 21st PPI worksheets equaled $23,721.54, which was adjusted to $24,682.91.[1] (Contents Inventory Summary, Romano Aff. Attach. B; Compl. ¶ 62.) During the time that the Schmitts' contents claim was being reviewed, State Farm advanced $3,000.00 to the Schmitts. (Romano Aff. ¶ 4; E. Schmitt Dep. 168:2-6; Compl. ¶8.)

In connection with her review of the contents claim, on August 22, 2008, Ms. Zidek sent to the Schmitts a letter that, in part, requested additional information and stated: "We also need you to document the amount of items purchased in 2007 and 2008. The amount of items you purchased in these years is substantially higher than your normal spending pattern." (Zidek Aff. ¶ 11, ECF No. 27-2; *see also* Zidek Aff. Attach. A.) Prior to sending the August 22, 2008 letter, Ms. Zidek was informed by Mrs. Schmitt by telephone on August 19, 2008 that the increase in the Schmitts spending was due to the fact that they no longer had a mortgage payment or private school payments for their sons and that their income was approximately $5,000 after taxes per month. Ms. Zidek informed Mrs. Schmitt that she could provide State Farm with documentation of their income, in particular, their tax return, to explain this increase, in lieu of receipts. (State Farm Activity Log, p. 29 at 08-19-08 1:19 PM, ECF 30-1, Exhibit 13.) Mrs. Schmitt provided State Farm with the requested documentation regarding the Schmitts' income on September 9, 2008 during a meeting with Mr. David Truxal and Mr. Vincent Romano. (State Farm Activity Log, p. 24 at 09-10-08 12:28 PM, ECF No. 30-1, Exhibit 14.) Mrs. Schmitt also provided Ms. Zidek with documentation that the mortgage on their home had been satisfied prior to the August 22, 2008 letter being sent. (Wells Fargo letter dated 12/20/2007 and Mortgage Release,

---

[1] Plaintiffs deny this fact on the basis that they are "without sufficient knowledge to determine the truth or falsity" of this statement. (Pls.' Concise Stmt. of Mat. Facts in Opp'n to Mot. for Partial Summ. J. ("Pls.' CSMF in Opp'n"),

Satisfaction, and Discharge, ECF No. 30-1, Exhibit 15.)  However, Mrs. Schmitt did not produce the receipts for their purchases in 2007 and 2008 since they were destroyed during the loss.  (E. Schmitt Dep. 193:22-24, 194.)

On September 9, 2008, State Farm Claim Team Managers Vince Romano and David Truxal had a four-hour meeting with the Schmitts at their residence to discuss the claim. (Compl. ¶ 54; Romano Aff. ¶6.)   During this meeting, Mrs. Schmitt discussed additional property losses (other than those items already claimed on the July 21st PPI worksheets) with Romano and Truxal.  (E. Schmitt Dep. at 214-231; Attach. C to Romano Aff.)  Plaintiff had completed PPI worksheets dated September 5, 2008 for the additional property losses, which she provided to Romano and Truxal at the September 9th meeting.  (E. Schmitt Dep. at 230-31.) With regard to the items claimed on the September 5, 2008 worksheets, Plaintiff showed Romano and Truxal photographs she had taken of the damaged property items.  (E. Schmitt Dep. at 215, 230.)  According to Mrs. Schmitt, Romano and Truxal told her that her claim for the items on the September 5th PPI worksheets was approved.  (E. Schmitt Dep. at 231.)

Also, at the September 9th meeting, Plaintiff discussed with Romano and Truxal other property losses not listed on either the July 21st or September 5th PPI worksheets.  (E. Schmitt Dep. at 216-229.)   After either examining the additional damaged property or viewing photographs showing the damage, Romano and Truxal advised Mrs. Schmitt to submit a claim for these items, which she did, subsequently, on PPI worksheets dated September 15, 2008 and September 18, 2008.  (E. Schmitt Dep. at 214-15; Attach. C to Romano Aff.)  The amount of the loss claimed on the September 15th and 18th PPI worksheets exceeded $10,000.00.  (Romano Aff. ¶8; Attach. C to Romano Aff.)  According to Mrs. Schmitt, Romano and Truxal advised her at the September 9th meeting that no further proof would be required for the items she was going to

claim on the September 15th and 18th PPI worksheets because they either observed the damaged property or viewed photographs of the damage (E. Schmitt Dep. at 214-15), and Jon Forgrave advised them that Neal of Serv Pro stated that almost everything was a loss (E. Schmitt Dep. at 214). Mr. Forgrave's entry in the activity log indicates that he okayed the disposal of items that were "iffy as far as being salvageable." (Pls.' App., Ex. 23 (State Farm Activity Log, p. 36 at 06-20-08 08:04 AM).)

On September 10, 2008, State Farm mailed to the Schmitts a check in the amount of $21,682.91 – representing $24.682.92 minus the $3,000.00 advance already paid, for the losses claimed on the July 21 PPI worksheets. (Romano Aff. ¶7; E. Schmitt Dep. 232:8-18; Compl. ¶ 61.) State Farm also issued payments in the amount of $8,193 for structural repairs. (Romano Aff. ¶ 7; Compl. ¶ 68.)

On September 23, 2008, State Farm received Plaintiffs' September 15th and 18th PPI worksheets.[2] (Romano Aff. ¶ 8; Attach. C to Romano Aff.)

## State Farm's Pre-Investigation Claim Handling

Regarding Plaintiffs' claim, State Farm communicated primarily with Mrs. Schmitt because Mr. Schmitt suffers from a "progressive neurological syndrome." (E. Schmitt Dep. 18-22.) Initially, Plaintiffs' claim was assigned to State Farm claim representative, Mr. Lancaster. (Exhibit 20 at 06-11-08 10:14 AM.) The claim was then reassigned to Jon Forgrave, who met with the Plaintiffs and inspected their property on June 18, 2008. (Compl. ¶¶ 19-20; Forgrave Aff., ¶ 5.)

In Mrs. Schmitt's words, Mr. Forgrave and she 'worked very well together at least at the beginning." She also stated "he was very nice to me." (E. Schmitt Dep. 81:19-20, 295:4.)

---

[2] The PPI worksheets dated September 9, 15 and 18, 2008, are collectively referred to as "September PPI worksheets" or "supplemental claim."

Nevertheless, Mrs. Schmitt asked that Mr. Forgrave be taken off her claim and wanted him replaced because, in her words, "I felt that we were not communicating well." (E. Schmitt Dep. 159:6-17, 166:17-20.) Regarding her communications with Jon Forgrave, Mrs. Schmitt stated:

> … I would actually call and say, "I don't know how to fill this out. Can you please just answer how to do this and just leave it on my machine."
> But what Jon would do is say, "Erin, it's Jon Forgrave [sic] calling. Here's my number. Give me a call."
> So maybe it was generational. I didn't want to keep bothering him calling him. I just wanted an answer, and I was getting frustrated; it is true.

> \* \* \*

> I think it was almost like he thought I was his mother.

(E. Schmitt Dep. 156:17-157:3, 159:16-7.)

In response to Mrs. Schmitt's complaints to State Farm's management about Mr. Forgrave, Claim Team Manager Vince Romano became more involved in reviewing the handling of her claim. (Romano Aff., ¶ 2.) In addition, State Farm assigned the Schmitts' claim to Sheryl Zidek. (E. Schmitt Dep. 159-60.) On July 10, 2008, Ms. Zidek met with Mrs. Schmitt and inspected her property. (Zidek Aff. ¶ 3.) Mrs. Schmitt described Ms. Zidek as "pleasant" and had no problems with her "at first." (E. Schmitt Dep. 160:7, 160:9-11.) According to Mrs. Schmitt, she became dissatisfied with Ms. Zidek's handling of the claim because, one, Ms. Zidek promised to call her before going on vacation but did not, and two, Ms. Zidek wrote the letter dated August 22, 2008. (E. Schmitt Dep. 162:6-14; Zidek Aff. Attach A.)

Because Mrs. Schmitt was upset and "p'd off" by the August 22nd letter, she called Vince Romano and advised him that she could not work with Ms. Zidek. (E. Schmitt dep., p. 185, lines 4-6, 12-21, p. 186, lines 3-12.) When Mrs. Schmitt made this call, she hoped that Mr. Romano would remove Ms. Zidek from the claim. (E. Schmitt Dep. 186:17-187:1.) Thereafter, Mrs.

Schmitt interacted with State Farm representative, Ginger Ellwanger; according to Mrs. Schmitt, "Ginger and I didn't meet, but we got along well on the phone." (E. Schmitt Dep. 199:16-7.)

Mrs. Schmitt also met and had telephone communications with State Farm Claim Team Manager David Truxal. (Truxal Aff. ¶¶ 3, 9, 10.) Mrs. Schmitt met with Mr. Truxal and Mr. Romano on September 9, 2008, and described them as "very pleasant" during this meeting. (E. Schmitt Dep. 217.) Mrs. Schmitt also described most telephone conversations with Mr. Truxal as "very pleasant." (E. Schmitt Dep. 200:2-6.) But Mrs. Schmitt felt that Mr. Truxal used a "harsh tone" in a message that he left on her answering machine; yet he was nevertheless "professional." (E. Schmitt Dep. 200-01.)

When asked how she was treated by Mr. Romano during her claim, Mrs. Schmitt testified:

> A.    98% of the time – 99.9% of the time, wonderful.
> Q.    And in that .1% of the time that he didn't treat you wonderful, what were the problems? Why do you answer not 100% of the time?
> A.    I think maybe it might have been just some confusion. You know, you can have miscommunications, and I just thought, you know, in my opinion I would've rather him ask me a question and we could've resolved it….

(E. Schmitt Dep. 259:11-23.)

### State Farm's Investigation of Plaintiff's Supplemental Submissions

On September 29, 2008, the Schmitts' claim was assigned to State Farm's Special Investigative Unit ("SIU") for further investigation. (Knight Aff. ¶ 2, ECF No. 27-3.) According to Darrell Knight, an investigator for the SIU, the claim was assigned to SIU for the following reason:

> The claim was referred to SUI because this claim initially was reported as a minor water loss, for which State Farm originally paid $8,193.91 for Coverage A, and $24,682.91 for Contents.

Then, the Schmitts submitted additional Contents Inventory forms with an additional value exceeding $10,000. State Farm believed it was questionable whether the additional contents being claimed actually existed and/or, if they did exist, whether they were damaged.

(Knight Aff. ¶ 2.) The Policy includes the following Condition:

**SECTION I AND II – CONDITIONS**

2. **Concealment or Fraud.** This policy is void as to you and any other **insured**, if you or any other **insured** under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance whether before or after a loss.

(The Policy at 19, ECF No. 27-4.)

Mr. Knight prepared a "Preliminary Report," dated October 3, 2008 which set forth a lengthy "Initial Analysis," and includes the following excerpts:

a. Upon review of this claim, I have noted similarities in Mrs. Schmitt's activities following both the prior [May 2001] and current water loss claims. (Knight Aff. Attach. A at 4.)

b. Mr. Forgrave documented a conversation with Neil of ServPro on June 20th suggesting that he approved throwing out some of the items and noted some of the items were being salvaged in the garage. He also noted that according to Neil, Mrs. Schmitt was creating an inventory of things as they were being thrown out. According to the notes, most of the items were being discarded except for a table and some other miscellaneous items being moved to the garage. (*Id.* at 5.)

c. When Mrs. Zidek arrived on July 7, 2008, all of the damaged items had already been disposed. (*Id.* at 6.)

d. Mrs. Zidek spoke with Mrs. Schmitt on August 19th to review the inventory forms submitted. Mrs. Zidek noted that according to the inventory forms, Mrs. Schmitt made about $15,000 worth of purchases since 2007….

e. Mrs. Zidek noted and questioned Mrs. Schmitt about the reported 9 pairs of sheets and a $350 comforter set that was claimed on the inventory. Mrs. Schmitt reported that she was bringing these items down to be washed when she discovered the water on the floor. She claims to have set the items on a chair and forgot about them so they had a musty smell that would not come out in the wash. Mrs. Zidek asked Mrs. Schmitt why she was washing 9 pairs of sheets and Mrs. Schmitt reported that she

washes all of her sheets at the same time whether they had been used or not. (*Id.*)

     f.     Mrs. Zidek questioned Mrs. Schmitt about the spending of $15,000 in one year on items stored in the basement.[3] (*Id.*)

(*See also* Zidek Aff. ¶ 9.)   As stated in his Preliminary Report, Mr. Knight had several concerns after reviewing the PPI forms, which concerns he identifies in his attached Affidavit and the Report.  (Knight Aff. ¶ 5; *see also* Knight Aff. Attach. A at 8-9.)

Mr. Knight also obtained recorded statements from Neil Martel and Mark Bougher, the owner and an employee of ServPro, respectively.  (Knight Aff. ¶ 8, *see also* Knight Aff. Attach. B.)   Parts of these statements are inconsistent with some of the assertions of Mrs. Schmitt.  (Knight Aff., Attach. B.)  Examples of these inconsistencies include:

     a.     Mrs. Schmitt has averred that she relied on ServPro to determine what should have been discarded and what should have been salvaged.   In contrast, Mr. Martel advised State Farm that he tried to talk Mrs. Schmitt out of discarding items that had little to no damage, but Mrs. Schmitt was very insistent that, if ServPro did not discard these items, she would throw the items out herself.

     b.     Mr. Martel advised State farm that most of the items thrown out in the dumpster had *not* been damaged.  He stated that they went through boxes, drawers, and plastic totes and discovered items that were not wet and did not have any damage.  But Mrs. Schmitt was adamant that everything be discarded.

     c.     Mr. Martel advised State Farm that he was amazed by the amount of clothing being claimed by the Schmitts.

(Knight Aff. ¶¶ 11-15; Compl. ¶ 25.)  Mrs. Schmitt never spoke to Darrell Knight.  (E. Schmitt Dep. 161:5-7.)

There were 146 individual items of clothing listed on the July 21st PPI worksheets, and an additional 51 individual items of clothing claimed on the September PPI worksheets.  (Knight Aff. ¶ 5; Romano Aff. Attach. A and C.)  Examples of items of clothing on the September PPI worksheets include 22 Oxford men's shirts ($60 each) and 4 pairs of men's boxers ($30 each).

---

[3] Plaintiff disputes that the items discussed with Ms. Zidek were all stored in the basement.  Rather, Plaintiff claims that some of the items purchased were stored elsewhere in the household.   (Pls.' App., Ex. 15, ECF No. 30-1.)

Two large hard coolers were also claimed. (Knight Aff. ¶ 5.)  Plaintiff claims that these were discarded by ServPro with the authorization of Mr. Forgrave.  (State Farm Activity Log, p. 36 at 06-20-08 08:04 AM, ECF No. 30-1, Exhibit 23.)

The July 21st PPI worksheets listed these electronic items:

> 35mm camera
> Lexmark printer
> IBM computer
> RCA VCR/DVD player
> RCA 13" TV with Radio/CD/DVD player
> Symphonic 19" TV
> 26" Panasonic TV
> Panasonic Stereo CD Player
> 2 CD Players
> 2 Shuffle iPods
> Singer sewing machine
> AT&T phone (with higher volume)

The September PPI worksheets claim these additional electronics:

> External hard drive (3 months old)
> Digital camera (2 months old)
> 2 Memory cards (2 months old)
> Weather emergency radio (4 months old)
> Sylvania DVR recorder
> Sony CD radio tape
> Sony portable video recorder
> Handheld DVD player
> "Heavy duty" paper shredder
> Cuisinart iron
> Black & Decker fryer with basket
> Magic Chef ice machine

(Knight Aff. ¶ 5.)  However, statements of the ServPro employees indicate that 1) the external hard drive may have been there; 2) they recalled the handheld DVD player; 3) the Sylvania DVR Recorder could have ended up in the garage; and 4) they recalled the ice cream machine which could have been the Magic Chef ice machine referred to in the inventory.  (Martel and Bougher Statement at 43, 45-6, ECF No. 27-3, Exhibit 24.)

Mr. Knight's report set forth the following "Investigator's Recommendation":

> Considering the similarities in the current and prior claim along with the expanding inventory forms submitted in September after all of the damaged items were reportedly disposed before July 7, 2008 along with the report from ServPro that the insured was instructing them to throw away items that were not damaged, it has been decided that we should proceed with an examination under oath of Mr. and Mrs. Schmitt in order to gather additional information on this claim and to consider the additional contents inventory claim.

(Knight Aff. Attach. A at 9.)

State Farm requested that the Schmitts submit to an examination under oath ("EUO") in a letter dated October 2, 2008, the day before Mr. Knight completed his Preliminary Report in which he also concludes that a EUO is necessary. (Pellegrino Letter, ECF No. 30-1, Exhibit 30; Knight Aff. ¶ 6.) To assist with obtaining the EUOs, State Farm retained David Rosenberg, Esquire. (Knight Aff. ¶ 9.) From October 2008 through May 2009, Attorney Rosenberg attempted to schedule Mrs. Schmitt's EUO. (Knight Aff. ¶¶ 18-21, *see also* Knight Aff. Attach. C; E. Schmitt Dep. 239, 241.) In response to Mr. Rosenberg's attempts, Mrs. Schmitt asserted that she could not attend an EUO because she had a closed head injury and/or because she could not retain counsel. (Knight Aff. ¶¶ 18-19; E. Schmitt Dep. 239-242.) Mr. Rosenberg, as counsel for State Farm, agreed to the delay in Mrs. Schmitt submitting to her EUO. (Knight Aff. Attach. C.)

The Policy states:

**SECTION I – CONDITIONS**

**2.     Your Duties After Loss**

d.     As often as we reasonably require:…

(2)     Provide us with records and documents we request and permit us to make copies;

(3)     Submit to and subscribe, while not in the presence of any other insured:

> (a)     statements; and
> (b)     examinations under oath.

(The Policy at 13.)

Before EUOs could be scheduled, the Schmitts filed this lawsuit in June 2009, pursuant to the State Farm policy's requirement that any suit relating to the insurance policy must be filed within one year of the occurrence. (*See* Notice of Removal, ECF No 1, Attach. 1.) Discovery has now closed; Defendant has filed the instant Motion for Partial Summary Judgment which has been fully briefed and responded to, and is ripe for disposition.

###    B.    Standard of Review

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to the party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P 56(e)) (emphasis added). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

C.     **Discussion**

State Farm has moved for summary judgment on Plaintiffs' statutory bad faith claim.  In

Pennsylvania, a private cause of action exists for bad faith conduct of insurers pursuant to 42 Pa.

Cons. Stat. Ann. § 8371, which provides, in relevant part:

> In an action arising under an insurance policy, if the court finds
> that the insurer has acted in bad faith toward the insured, the court
> may take all of the following actions:
> (1)  Award interest on the amount of the claim from the date the
> claim was made by the insured in an amount equal to the prime
> rate of interest plus 3%.
> (2)  Award punitive damages against the insurer.
> (3)  Assess court costs and attorney fees against the insurer.

"Bad faith" is not defined in the statute, however, courts interpreting Pennsylvania law have held

that a § 8371 claim contains two elements:  (1) the insurer lacked a reasonable basis for denying

benefits under the applicable policy, and (2) the insurer knew or recklessly disregarded the lack

of a reasonable basis for refusing the claim.  *Employers Mut. Cas. Co. v. Loos,* 476 F. Supp. 2d

478, 490 (W.D. Pa. 2007) (citing *Terletsky v. Prudential Prop.,* 649 A.2d 680, 688 (Pa. Super.

Ct. 1994)); *see also Horowitz v. Fed. Kemper Life Assur. Co.,* 57 F.3d 300, 307-08 (3d Cir.

1995) (citing *D'Ambrosio v. Pa. Nat'l Mut. Cas. Ins. Co.,* 431 A.2d 966, 971 (Pa. 1981)).  The

level of culpability required to prove bad faith is something more than mere negligent conduct

which is harmful to the insured.  *Loos*, 476 F. Supp. 2d at 490 (citing *Brown v. Progressive Ins.*

*Co.,* 860 A.2d 493, 501 (Pa. Super. Ct. 2004)).  The superior court expounded on this point in

*O'Donnell ex rel. Mitro v. Allstate Insurance Co.*:

> [O]ur Court has adopted the following definition of "bad faith" as
> applicable in the context of insurance:
>> "Bad faith" on part of insurer is any frivolous or unfounded
>> refusal to pay proceeds of a policy; it is not necessary that
>> such refusal be fraudulent.  For purposes of an action against
>> an insurer for failure to pay a claim, such conduct imports a
>> dishonest purpose and means a breach of a known duty (i.e.,

> good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

734 A.2d 901, 905 (Pa. Super. Ct. 1999) (citing *Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1232 (Pa. Super Ct. 1994) (quoting *Black's Law Dictionary* 139 (6th ed. 1990))) (other citation omitted). Considerations of "the motive or self-interest or ill will" of the insurer are not a third element of a bad faith claim, but rather, are probative of the second element enumerated in *Terletsky, i.e.*, "the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim.'" *Loos*, 476 F. Supp. 2d at 491 (quoting *Terletsky*, 649 A.2d at 688).

The standard of proof required to establish a statutory bad faith claim against an insurer under Pennsylvania law is clear and convincing evidence. *Loos*, 476 F. Supp. 2d at 491 (citing *Terletsky*, 649 A.2d at 688) (footnote omitted); *Nw. Mut. Life Ins. Co. v. Babayan,* 430 F.3d 121, 137 (3d Cir. 2005) (citing *Terletsky*, *supra*). "The 'clear and convincing' standard requires that the plaintiff show 'that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.'" *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004) (quoting *Bostick v. ITT Hartford Group, Inc.*, 56 F. Supp.2d 580, 587 (E.D. Pa. 1999)). Accordingly, State Farm's summary judgment motion as to Plaintiffs' bad faith claim must be evaluated with the clear and convincing evidence standard in mind. *Loos,* 476 F.Supp. 2d at 492; *Babayan*, 430 F.3d at 137 (noting that "the insured's burden in opposing a summary judgment motion brought by the insurer is 'commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial.'") (quoting *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp.2d 583, 588 (E.D. Pa. 1999)).

In the case at bar, the gravamen of Plaintiffs' § 8371 bad faith claim is that State Farm engaged in bad faith conduct by treating the claim investigation process as an adversarial process and by treating Plaintiffs as adversaries rather than as policyholders. (Compl. ¶ 89.) In addition, Plaintiffs contend that State Farm has acted in bad faith by its failure to conduct a fair and reasonable investigation of their claim, and by denying their claim due to lack of information and/or one-sided information. (Compl. ¶¶ 92-93.) Furthermore, Plaintiffs advance the argument that State Farm acted in bad faith by ignoring evidence which supports coverage for their claim. (Compl. ¶ 94.)

State Farm seeks summary judgment on Plaintiffs' bad faith claim on the grounds that Plaintiffs cannot establish by clear and convincing evidence that State Farm acted in bad faith since State Farm had a reasonable basis for investigating and withholding payment of Plaintiffs' supplemental claim. In the event that this Court denies its Summary Judgment Motion, State Farm contends that there is no basis for an award of punitive damages. In response, Plaintiffs submit that there is evidence to support such a claim for bad faith, and that punitive damages are proper.

With respect to its first argument, State Farm submits that an insurer does not act in bad faith by investigating legitimate issues of coverage. In support, State Farm cites *Hyde Athletic Industries, Inc. v. Continental Casualty Co.*, in which our sister court in the Eastern District held that the insurer had not acted in bad faith by investigating and subsequently denying Plaintiff's claims. 969 F. Supp. 289, 307 (E.D. Pa 1997). In concluding that the § 8371 bad faith claim should be denied, the district court opined:

> Every allegation of bad faith conduct relates to Defendants' investigation and denial of Plaintiffs' claims. While an insurance company has a duty to accord the interests of its insured the same consideration it gives its own interests, an insurer is not "bound to

17

> submerge its own interest in order that the insured's interests may
> be made paramount," *Cowden v. Aetna Cas. and Sur. Co*., 389 Pa.
> 459, 134 A.2d 223, 228 (1957), and an insurer does not act in bad
> faith by investigating and litigating legitimate issues of coverage.

*Id.* (footnote omitted). Similar to the case at bar, the plaintiffs in *Hyde* asked the court to send to a jury the claims of bad faith related to the insurers' investigation of the plaintiffs' claim. The district court in *Hyde* concluded that "the crux of a bad faith claim under § 8371 is denial of coverage by an insurer when it has no good reason to do so." *Id.* (citing *Jung v. Nationwide Mut. Fire Ins.* Co., 949 F. Supp. 353, 360 (E.D.Pa. 1997)). In *Hyde,* as in the present case, the plaintiffs claimed bad faith prior to the entry of a decision, whether favorable or unfavorable, and in both cases, the claims were based not on bad faith nonpayment, but were related to the insurers' investigation of the merit of plaintiffs' claims.

To the extent Plaintiffs' bad faith claim is predicated upon State Farm's failure to pay any amount on their supplemental claim without any reasonable basis, this Court notes that at the time Plaintiffs filed the Complaint, State Farm was undergoing active investigation of Plaintiffs' supplemental claim, and had not yet determined whether it was going to accept or deny it. Nonetheless, Plaintiffs contend that State Farm has had more than adequate time to investigate the insurance claim at issue, and has failed to provide any credible reason for denial of Plaintiffs' insurance claim. As explained below, Plaintiffs' argument lacks merit.

The Pennsylvania Superior Court considered this precise argument in *O'Donnell,* and determined that the defendant insurance company's failure to accept or deny a claim after conducting a lengthy investigation prior to the commencement of the suit was not evidence of bad faith on the part of the insurance company. 734 A.2d at 907. In reaching this conclusion, the superior court noted the existence of many "red flags," as identified and explained by defendant insurance company's expert, and which arose before litigation was commenced. *Id.*

Such "red flags" included unexpectedly high dollar values in estimated losses. *Id.* at 907 n. 7. Similarly here, Mr. Knight's preliminary report notes several red flags in his investigation of Plaintiffs' supplement claim.

In further support of its argument, State Farm submits that given the extensive personal property damages already submitted in the July 21st PPI worksheets and the amount already paid for those items, it was concerned that the Schmitts' submission of the September PPI worksheets constituted a material misrepresentation regarding their loss. Pursuant to the express terms of the Policy, a material misrepresentation of a fact or circumstance would void the Policy, and because of that, State Farm contends it had a legitimate interest in determining whether the Schmitts actually suffered the loss claimed. In addition, State Farm submits that its decision to request EUOs to investigate the potential misrepresentation was reasonable and appropriate, citing *Parasco v. Pacific Indemnity Co.,* 920 F.Supp. 647 (E.D.Pa. 1996), and *Salerno v. New Brunswick Fire Ins. Co.,* 72 Pa. D. & C. 33, 35, 1950 WL 3085 at *2 (Lack. Ct. Com. Pl. 1950) (holding that a provision in an insurance policy that required the insured to appear for an examination under oath pertaining to matters related to the risk insured under the policy was "unquestionably valid and generally so considered.").

In *Parasco*, the homeowners brought a bad faith claim against their insurer who conducted an investigation based on suspected misrepresentations regarding their claim for property loss caused by a fire. *Parasco,* 920 F.Supp. at 652. In concluding that the insurer had good cause to deny the homeowners' claim, the district court found that, in addition to the undisputed evidence of record, the insurer had not "conducted the investigation in a biased fashion, or for the improper purpose of evading its contractual duty to pay valid claims." *Id.* at 656 (footnote omitted). The district court further found the insurance company's investigation of

the claim included an examination under oath of Mr. Parasco who, when given the opportunity to relate his version of the facts, lied under oath regarding matters material to the investigation. *Id.* Under those circumstances, the district court concluded that the homeowners could not prevail on their statutory bad faith claim. *Id.*

State Farm submits that as in *Parasco,* the record here contains nothing that would suggest that State Farm conducted its investigation in a biased manner, or for the improper purpose of evading its contractual duty to pay valid claims. The Court agrees with State Farm. The uncontroverted evidence here shows that State Farm paid out $24,682.91 in property damages, and $8,193.00 for structural repairs on Plaintiffs' claim, before it began to suspect possible material misrepresentations in Plaintiffs' supplement claim. Moreover, the handling of Plaintiffs' claim by the various State Farm representatives was, by Mrs. Schmitt's own account, professional. Nothing in Mrs. Schmitt's testimony regarding her interactions with the various State Farm representatives (or anywhere else in the record) would lead a reasonable jury to find that State Farm's conduct was motivated by ill will, or could be construed as purposefully evading its contractual duties. Finally, the Policy expressly provides for the use of EUOs by State Farm to investigate a claim, and thus, its request that Mrs. Schmitt submit to an EUO is both reasonable and proper. *Leo v. State Farm Mut. Auto. Ins. Co.,* 939 F.Supp. 1186, 1191 (E.D.Pa. 1996) ("Because State Farm's request for a statement under oath was proper under the policy's terms, State Farm had a reasonable basis for requesting the statement under oath in order to evaluate the plaintiff's UIM claim."); *Murphy v. Fed. Ins. Co.,* 206 F. App'x 143, 148 (3d Cir. 2006) (the insurer had the right to take the depositions of insureds where policy unambiguously provided for same; insured's refusal to cooperate in investigation and allow depositions of

family members justified granting of summary judgment in favor of insurer on plaintiff's bad faith claim).

Plaintiffs' attempt to distinguish *Parasco* falls short of the mark. Plaintiffs argue that the district court's decision, finding that Mr. Parasco made material representations to the insurer regarding his claim, was predicated upon affidavits of third parties that refuted the statements made by Mr. Parasco to the insurer. Plaintiffs submit that no such evidence has been adduced here either in State Farm's investigation or subsequently in discovery. According to Plaintiffs, the suspicions of State Farm's claims representatives that Mrs. Schmitt has been untruthful are not a reasonable basis to deny an insurance claim. At the outset, the Court notes that State Farm has not *denied* Plaintiffs' claim. The investigation of their supplemental claim was ongoing when Plaintiffs instituted the present action. Moreover, nothing in *Parasco* suggests that affidavits from third parties are required to conduct an investigation of a supplemental claim, including that the insureds submit to an EUO. Plaintiffs fail to cite any authority for their position, and the Court is not aware of any such requirement. Indeed, the Policy specifically provides as a condition of coverage that Plaintiffs submit to EUOs. Policy at 13.

In opposing the summary judgment motion, Plaintiffs contend that "State Farm relies solely on conclusory statements made by its own representatives, each of which is not supported by any independent evidence and instead is based solely upon the assumption of the claims representative." Pls.' Br. in Resp. at 9, ECF No. 29. Plaintiffs seem to rely on law governing motions for summary judgment in Pennsylvania courts, which provides that "[o]ral testimony alone, either through testimonial affidavits or depositions, of the moving part or the moving party's witnesses, even if uncontradicted, is generally insufficient to establish the absence of a genuine issue of material fact." Pa. R.C.P. No. 1035.2 Official Note (citing *Nanty-Glo v. Am.*

*Surety Co.*, 163 A. 523 (Pa. 1932); *Penn Center House, Inc. v. Hoffman*, 553 A.2d 900 (Pa. 1989)). The standard annuciated by the Pennsylvania Supreme Court in *Nanty-Glo* is inapplicable to summary judgment motions in federal court. As stated above, summary judgment motions in federal court are governed by the Federal Rules of Civil Procedure, in particular, Rule 56. The argument that testimony from State Farm employees such as Ms. Zidek or Mr. Knight should be disregarded, and that the lack of testimony from a third party should be considered significant, is completely unfounded.

While the *O'Donnell* court found that "section 8371 is not restricted to an insurer's bad faith in denying a claim," and that "[a]n action for bad faith may also extend to the insurer's investigative practices," the evidentiary burden is on a plaintiff to establish such a claim by clear and convincing evidence. *O'Donnell,* 734 A.2d at 906. In the instant case, Plaintiffs provide no evidence to suggest that State Farm's investigation was conducted in a biased fashion, or for the improper purpose of evading its contractual duty to pay valid claims. Furthermore, as State Farm did not deny coverage with respect to Plaintiffs' claims, either at the outset of this litigation or at the current time, then there is little, if any, evidence to suggest that (1) the insurer lacked a reasonable basis for denying benefits under the applicable policy, or that (2) the insurer knew or recklessly disregarded the lack of a reasonable basis for refusing the claim. *Loos,* 476 F. Supp. 2d at 490 (citing *Terletsky,* 649 A.2d at 688 (Pa. Super. Ct. 1994)).

The crux of Plaintiffs' opposition to the Motion for Partial Summary judgment here is their assertion that State Farm cannot offer evidence supporting its suspicion that Plaintiffs misrepresented their personal property loss. In fact, State Farm has come forward with significant evidence to the effect that its investigation of Plaintiffs' supplemental claim had a reasonable basis. Defendant has produced witnesses from both State Farm and ServPro whose

testimonies contradict certain statements made by Mrs. Schmitt regarding the property loss. State Farm also points to the credibility of Mrs. Schmitt's statement that she was carrying nine sets of sheets and a comforter while on crutches after sustaining an ankle injury. (E. Schmitt Dep. 20, 45-6, 100.) The reasonableness of State Farm's investigation is also supported by the unusually large number of expensive electronics and clothing items present in the basement.

Plaintiffs have not come forward with clear and convincing evidence to dispute the reasonable basis proffered by State Farm for its investigation of the Plaintiffs' supplemental claim. Plaintiffs instead have relied on their position that State Farm is unable to produce evidence supporting its position. As a result, Plaintiffs have not met the evidentiary standard to oppose the motion. To withstand summary judgment, the opposing party "must raise more than a mere scintilla of evidence in its favor and may not merely rely on unsupported assertions, conclusory allegations or mere suspicions." *Gringeri v. Maryland Cas. Co.*, Civ. A. No. 97-7373, 1998 WL 212762, at *5 (E.D. Pa. Apr. 29, 1998) (citing *Penchishen v. Stroh Brewery Co.*, 932 F. Supp. 671, 673 (E.D. Pa. 1996)). Plaintiffs bear the burden of proving that State Farm's referral to its SIU for further investigation, or that its request for an EUO were done in sufficient bad faith to sustain a claim under § 8371. They have not done so. Therefore, the Court recommends that summary judgment be entered in favor of State Farm on Plaintiffs' bad faith claim. As such, the Court need not address State Farm's alternative argument as to punitive damages, as that issue is now moot.

III. <u>CONCLUSION</u>

For the reasons set forth above, the Court finds that no material issues of fact exist and that a reasonable fact finder could not find that there was no reasonable basis for State Farm's

investigation of Plaintiffs' supplemental claim. Therefore, the Court finds that Defendant State Farm is entitled to judgment as a matter of law on Plaintiffs' statutory bad faith claim. Accordingly, it is respectfully recommended that the Motion for Partial Summary Judgment (ECF No. 23) filed by Defendant, State Farm Fire and Casualty Company, be granted and that the statutory bad faith claim set forth in Count II of the Complaint be dismissed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

Dated: August 12, 2011                     By the Court:


  /s/ Lisa Pupo Lenihan
LISA PUPO LENIHAN
Chief U.S. Magistrate Judge

cc:      All Counsel of Record
         *Via Electronic Mail*